BARNES, J., for the Court.
¶ 1. William G. Scott appeals the judgment of Circuit Court of Hinds County, First Judicial District, convicting him of *876 capital murder and sentencing him to life in prison without the possibility of parole. Finding error, we reverse the judgment of the trial court and remand the case for a new trial.
SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. On July 9, 2002, the assistant manager of the Cash Depot in Jackson, Mississippi, arrived at work to find Paula Din-kins, a clerk at the store, dead of an apparent gunshot wound. The investigation lead the Jackson Police Department (JPD) to Scott, who resided in Georgia at the time. The JPD contacted the Marietta Police Department in Georgia and informed them of an outstanding misdemeanor traffic warrant for Scott in Rankin County, Mississippi. The Marietta police then arrested Scott on Georgia charges of possessing a stolen license plate and an altered social security card. Detectives Allen White and Keith Denson of the JPD subsequently traveled to Georgia to question Scott. At the hearing on the motion to suppress filed by Scott, White and Den-son testified that, prior to interviewing Scott, they read him his Miranda rights and allowed him to read the rights form. According to White and Denson, Scott then signed a written waiver of his Miranda rights. The detectives further testified that Scott then executed a signed statement in which he confessed to killing Dinkins. In addition to Detectives White and Denson, a notary and a jail guard were present when the written confession was executed.
¶ 3. On December 20, 2002, Scott was indicted by a Hinds County grand jury for the capital murder of Dinkins and was appointed a lawyer from the Hinds County Public Defender’s Office. Subsequently, Scott came to feel that his lawyer was not handling his case properly; so he began to file pro se motions with the trial court. Among these motions were a motion to compel, two motions to subpoena alleged alibi witnesses, two motions to suppress his alleged confession, a motion to substitute court-appointed counsel, and a motion for a continuance. Of particular relevance to this appeal are the two motions to dismiss for a speedy trial violation. Scott was arrested on July 23, 2002, indicted on December 20, 2002, and brought to trial on March 28, 2005. There were three continuances entered in Scott’s case: one on April 21, 2003, one on July 14, 2003, and one on January 19, 2004. Scott acknowledges that these three continuances were attributable to him and contends that they encompass the time span from April 21, 2003, until November 5, 2004. He contends that the remaining 392 days were attributable to the State. The State did not file any response to Scott’s motions to dismiss.
¶ 4. On March 22, 2005, Scott’s attorney filed a motion to withdraw due to a potential violation of Mississippi Rule of Professional Conduct 3.3. On March 23, 2005, the trial court denied Scott’s pro se motion for substitution of counsel and his motion to dismiss for a speedy trial violation. With regard to Scott’s speedy trial motions, the trial court stated that trial had been set for March 28, 2005, in a timely manner with consideration of the court’s overcrowded docket and the time needed for preparation of Scott’s defense. Accordingly, the trial court concluded that Scott’s speedy trial motions were moot. The trial court denied the motion for substitution of counsel on the grounds that Scott’s appointed attorneys were familiar with the case and that appointment of new counsel would result in delay of the trial, which would be contrary to Scott’s speedy trial motion.
*877 ¶ 5. At the commencement of Scott’s trial, the trial court held a hearing on Scott’s motions to suppress. At the beginning of the hearing, Scott’s counsel reiterated his motion to withdraw and asked the trial court for an ex parte conference on the circumstances surrounding his desire to withdraw. The trial court granted the ex parte conference, during which Scott’s attorney told the judge that Scott had confessed to committing the crime. He further stated that Scott intended to testify that he did not commit the crime and provide alibi witnesses. The attorney stated that he had attempted to dissuade Scott from taking the stand, but he was unsuccessful in doing so.[1] Following the ex parte conference, the trial court denied the motion to withdraw on the grounds that a new attorney would face the same issue as Scott’s current counsel. After conducting a hearing, the trial court denied Scott’s motions to suppress, finding that the evidence showed that Scott was read, and subsequently waived, his Miranda rights and that his confession was knowing and voluntary.
¶ 6. At the close of the State’s case, Scott’s attorney moved for a directed verdict, which the trial court denied, and sought another ex parte conference with the trial judge, which was granted. During the conference, Scott’s attorney renewed his motion to withdraw and, in the alternative, sought a court order directing him only to allow Scott to testify in the narrative. The court denied the motion to withdraw but issued an order stating that if Scott chose to take the witness stand, he would be allowed to give a narrative statement on direct and be subject to cross-examination by the prosecutor.
¶ 7. Scott was found guilty of capital murder and given a life sentence. His attorney filed a motion for new trial or, in the alternative, a judgment notwithstanding the verdict. The trial court denied the motion, and Scott’s trial attorney was subsequently permitted to withdraw based on Scott’s intention to allege ineffective assistance of counsel on appeal. Scott later filed a pro se motion for a new trial, arguing, inter alia, that the trial court erred in: (1) failing to suppress his confession because the notary public who was present when he allegedly signed the confession did not testify at trial; (2) admitting a Miranda rights waiver that did not have his signature on it; (3) denying him his right to a speedy trial; and (4) denying Ms motion for substitution of counsel and his attorney’s motion to withdraw. The trial court denied the motion.
¶ 8. Scott then filed the instant appeal on the following grounds: (1) the trial court erred in failing to grant his counsel’s motion to withdraw; (2) the trial judge erred in not recusing herself after Scott’s counsel revealed that Scott had allegedly confessed to committing the crime; (3) he was denied both counsel and the right to be present at a critical phase of the prosecution when the trial court did not allow him to be present during the two ex parte conferences in which defense counsel revealed alleged client confidences; (4) the trial court erred in denying his motion to dismiss for a speedy trial violation; (5) the trial court erred in failing to suppress his alleged confession after the State failed to produce all parties who were witnesses to the confession at the suppression hearing in accordance with Agee v. State, 185 So.2d 671 (Miss.1966); (6) the trial court erred in not granting a mistrial after the prosecutor repeatedly called Scott a “shyster” and “con artist”; and (7) he received ineffective assistance of counsel. We agree that the *878 trial judge erred in failing to recuse herself; therefore, we reverse and remand with instructions that Scott be provided a new trial before a different judge.
STANDARD OF REVIEW
¶ 9. With regard to Scott’s claims that the trial judge erred in failing to declare a mistrial after the prosecutor’s closing argument and failing to recuse herself, the standard of review is abuse of discretion. Wright v. State, 958 So.2d 158, 161(¶6) (Miss.2007) (citing Pulphus v. State, 782 So.2d 1220, 1223(¶ 10) (Miss. 2001) (“The standard of review for denial of a motion for mistrial is abuse of discretion.”)); White v. Yellow Freight Sys., 905 So.2d 506, 515(¶28) (Miss.2004) (quoting Neal v. State, 687 So.2d 1180, 1185 (Miss.1996) (“The standard of review by which this Court determines whether the trial judge erred in refusing to disqualify himself is whether the trial judge committed a ‘manifest abuse of discretion.’ ”)). As to Scott’s claim that the trial court failed in not suppressing his confession in accordance with Agee, “ ‘[t]he standard of review regarding a trial judge’s ruling at a suppression hearing is whether substantial credible evidence was present to support the trial judge’s finding when evaluating the totality of the circumstances.’ ” Mayes v. State, 925 So.2d 130, 134(¶8) (Miss.Ct.App.2005) (quoting Greer v. State, 818 So.2d 352, 355(¶ 10) (Miss.Ct.App. 2002)). “Since the trial judge sits as the finder of fact in determining the voluntariness of a confession, this Court will not disturb the trial judge’s decision unless it is manifestly wrong.” Id. Finally, with regard to Scott’s speedy trial claim, “[r]e-view of a speedy trial claim encompasses the fact question of whether the trial delay rose from good cause.” Miller v. State, 956 So.2d 221, 225(¶ 10) (Miss.2007) (quoting DeLoach v. State, 722 So.2d 512, 516(¶ 12) (Miss.1998)). “Under this Court’s standard of review, this Court will uphold a decision based on substantial, credible evidence. If no probative evidence supports the trial court’s finding of good cause, this Court will ordinarily reverse.” Id.
I. Did the trial judge err in not re-cusing herself after Scott’s counsel informed the judge, who acted as finder of fact with regard to Scott’s motion to suppress his confession, that Scott had confessed to committing the crime for which he was on trial?
¶ 10. Scott argues that he was denied his due process right to a fair trial when the trial judge failed to recuse herself upon being told by Scott’s defense counsel that Scott had confessed to committing the crime and intended to offer perjured testimony at trial.[2] Scott contends that, because the trial judge sat as the finder of fact on the motion to suppress his confession, the statements of defense counsel about Scott’s alleged admission of guilt prevented the judge from being objective and impartial.[3]
*879 ¶ 11. With regard to recusal, the Mississippi Supreme Court has stated as follows:
This Court applies an objective standard in deciding whether a judge should have disqualified himself. “A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality.” Article 6, § 165 of the Mississippi Constitution (1890) provides in part: “No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties.” “The decision to recuse or not to recuse is one left to the sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application.” On appeal, a trial judge is presumed to be qualified and unbiased and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption. When a judge is not disqualified under the constitutional or statutory provisions the decision is left up to each individual judge and is subject to review only in a case of manifest abuse of discretion. In determining whether a judge should have recused himself, the reviewing court must consider the trial as a whole and examine every ruling to determine if those rulings were prejudicial to the complaining party.
Jones v. State, 841 So.2d 115, 135(¶ 60) (Miss.2003) (citations omitted).
¶ 12. At the beginning of Scott’s trial, prior to the hearing on the motion to suppress, Scott’s counsel requested an ex parte conference so that he could inform the judge of a perceived ethical dilemma. The judge granted the ex parte conference, during which the following transpired:
The court: Let the record indicate that it is an ex parte hearing. That the persons present are Court staff, law clerk, bailiff, and the court administrator, Mr. Knapp (defense counsel)_
The court: You may proceed. And for the record, I’d like to have the court reporter to have this entire ex parte meeting under seal. You may proceed, Counsel.
Mr. Knapp: ... The situation I have here is I have been told directly by my client that he committed this crime, and that he intends to take the witness stand and -provide alibi witnesses that will say he’s somewhere else. And he’s got a long involved testimony. What it would involve if I questioned him would—
[[Image here]]
The court: A client has never told you they were guilty before?
Mr. Knapp: Yes, Your Honor, they have. Well, yes, Your Honor, they have. Several months ago we were negotiating with Philip Weinberg to try to avoid the death penalty, and it was a dispute between the life in prison with parole and life in prison without parole. At that point in time, the client told me substantial details about the murder. Now the mere fact he changes his minds, we have many clients change their story, but this last week was just up in your face. You know, I’m going to get on the witness *880 stand, but I did it. And since it was him — plus alibi witnesses, which I couldn’t find. We looked for these witnesses two months.
[[Image here]]
Mr. Knapp: And I believe that’s what you’d find if you found every one of these witnesses, Your Honor. I believe he knows he’s looking at, you know, life in the penitentiary. And, you know— but that’s the basis of his continuance. What bothers me, Your Honor, is the severe restrictions its places upon me. Because without that statement in my face, if I was another lawyer even if I suspected, I would have never brought it up. I mean I’ve gone down to the jail several times and, you know, thought I’m not believing that, and it doesn’t bother me. But this one was in my face, and I’m going to get to. the stand. I tried to talk him out of getting on the stand. He says no. And I’ve told him I cannot suborn perjury. And that is my fear and for myself — well, I’m not afraid of that because I’m not going to do it. The court: But wouldn’t you think that’s going to be the case with every attorney he has?
Mr. Knapp: Well, Your Honor, no. And for this reason, he knows that he messed up telling me he did it. And the first time he told me was before he talked to a quote “jailhouse lawyer” to say, hey, this might be a good thing to piddle with the Court.
And I have talked to him so extensively. He’s even said well, I shouldn’t have told you. And another lawyer will have suspicions, but I really believe you have to have something as strong as I’m stating into the record to be doing the same thing. And this was a man who will be riding rich for the rest of his life. He’s an intelligent guy. He’s got two years of college or you’ve seen his thing [sic]. Well, there’s another guy down there helping him out. There will be more appeals and writs and post conviction releases than you can imagine. He’ll do it until he’s dead. He will never tell another lawyer that he did it again. He knows that. And without that, the conflict is not there. I mean it took that for me to get here.
(Emphasis added).
¶ 13. Scott contends that, once his attorney revealed to the trial judge that Scott had confessed to the crime, the judge, who would eventually sit as the trier of fact on Scott’s motion to suppress his confession, should have recused herself. He contends that the judge’s failure to do so resulted in his being denied a fan-trial. We agree and find that Scott is entitled to a new suppression hearing and a new trial before an impartial judge.
¶ 14. Scott’s trial attorney cited Mississippi Rule of Professional Conduct 3.3 as the reason for his motion to withdraw. This rule, entitled “Candor Toward The Tribunal,” states as follows in pertinent part:
(a) A lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal;
(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
[[Image here]]
(4) offer evidence that the lawyer knows to be false....
(b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information other *881 wise protected by Rule 1.6.[4]
Miss. R. Prof. Conduct 8.3. Scott’s counsel argued that he could not continue to represent Scott because he could not, in accordance with Rule 3.3, put Scott on the stand and question him knowing that he would perjure himself. While we commend Scott’s attorney for attempting to abide by the rules of ethics, and while we make no judgment as to the appropriateness of his actions in doing so, we find that, once Scott’s attorney informed the judge that Scott had confessed to the crime, the judge was thereafter precluded from judging the merits of Scott’s motion to suppress and should have recused herself.
¶ 15. In Lowery v. Cardwell, 575 F.2d 727 (9th Cir.1978), the United States Court of Appeals for the Ninth Circuit was faced with a situation similar in many respects to the one at bar. The defendant was accused of first degree murder and tried in a bench trial. Id. at 728. After the defendant testified that he did not commit the murder, his counsel, in an in-chambers conference without the defendant present, moved to withdraw from representation but refused to state his reason for doing so. Id. at 729. The court denied the motion, and the defendant was later convicted. Id. On appeal, the court was faced with the issue of “whether the motion to withdraw, made when it was and under the circumstances then existing, served to deprive [the] appellant of [a] fair trial.” Id. at 729-30. The court concluded that it did, stating as follows:
We start with the basic proposition that if, under these circumstances, counsel informs the fact[-]finder of his belief he has, by that action, disabled the fact[-]finder from judging the merits of the defendant’s defense. Further, he has by his action openly placed himself in opposition to his client upon her defense. The consequences of such action on the part of counsel, in our judgment, are such as to deprive the defendant of a fair trial. If in truth the defendant has committed perjury (a fact we do not know in this case) she does not by that falsehood forfeit her right to a fair trial.
The question presented, then, is whether what here occurred amounted to such an unequivocal announcement to the fact[-]finder as to deprive appellant of due process. In our judgment it must be said that it did. The judge, and not a jury, was the fact[-]finder. From the testimony of appellant that we have quoted, from the fact that the examination of appellant ceased abruptly at that point with a request for a recess, from the making of the motion to withdraw and counsel’s statement to the court that he could not state the reason for his motion, the only conclusion that could rationally be drawn by the judge was that in the belief of her counsel appellant had falsely denied shooting the deceased.
Id. at 730. Thus, the court found that the defendant was deprived of a fair trial in violation of the Sixth Amendment. In so holding, the court stated:
That this is an unhappy result cannot be denied. Trial counsel is to be commended for his attention to professional responsibility. Nor can criticism be leveled at the trial judge for his confidence in his ability to remain unaffected by the motion to withdraw. We are acutely aware of the anomaly presented when mistrial must result from counsel’s bona fide efforts to avoid professional irresponsibility. We find no escape, however, from the conclusion that fundamental requisites of fair trial have been irre *882 trievably lost. Whether a just result nevertheless was reached would be a futile and irrelevant inquiry.
Id. at 731.
¶ 16. In Ferguson v. State, 507 So.2d 94, 97-98 (Miss.1987), the Mississippi Supreme Court relied on Lowery in finding that a violation of the Sixth Amendment occurred when the defendant’s lawyer, during a bench trial, called the defendant a liar. During his bench trial, Ferguson made numerous requests to replace his attorney. Id. at 95. On one such occasion, the court inquired as to whether the State had kept from Ferguson any information necessary to his defense. Id. Ferguson’s trial counsel responded: “Not a thing, I have been lied to by my client and I do not feel I can even sit here with him, and I regret it, but it is a fact, and I think the court ought to know it.” Id. Later, the attorney told the court: “Your Honor, he is lying, and I am getting tired of it.” Id. On appeal, Ferguson argued that his attorney’s performance was ineffective; the court stated as follows:
We are of the opinion that an independent violation of the Sixth Amendment occurred in the present case when Ferguson’s lawyer denounced him as a liar in open court before the trier of fact, and that this was an evil of such magnitude that no showing of prejudice is necessary for a reversal.
Id. at 97. After discussing Lowery, the court held that the defendant was deprived of a fair trial when his lawyer branded him a liar in open court. Id. at 97-98. The court remanded the case for Ferguson to be provided a new trial. Id. at 98. Importantly, the court stated:
We have great faith in Mississippi’s trial judges, but it is no great disparagement of them to doubt that any of them could have retrieved this situation. We are certain that the trial judge made every effort to consider the evidence impartially and render a fair verdict. However, he would have to have been more than human to be entirely unaffected by incidents of this type. He should have declared a mistrial immediately after trial counsel’s first outburst.
Id. at 97-98.
¶ 17. Finally, in Butler v. United States, 414 A.2d 844 (D.C.App.1980), defense counsel, at a pretrial hearing, told the judge, who was to decide defendant’s motion to suppress and subsequent bench trial, that the prosecution’s case was “open and shut,” and he did not want to allow the defendant to testify because of inconsistent statements the defendant had made regarding his possession of the murder weapon. Id. at 845. The defendant argued that his counsel’s actions amounted to ineffective assistance of counsel. Id. at 848-49. The court agreed, finding that defense counsel had “unnecessarily betrayed the confidences of his client.” Id. at 851. The court also found that the trial judge, who was sitting as finder of fact, should have recused himself following defense counsel’s revelation, stating the following:
It is difficult to imagine how the neutrality of a judge could remain free from compromise when it had been told by defense counsel that the government’s case can be proved beyond a reasonable doubt and that the defendant intends to commit perjury. When the court has regard for the ability and honesty of the lawyer, as the court apparently did here, the credibility of the defendant would necessarily suffer in direct proportion to such regard. Under such circumstances recusal and certification, to another court is the desired procedure ... and we hold that it is mandated. Error in failing to do so is compounded when the judge sits as the trier-of-fact. The due *883 process clause commands fundamental fairness in factfinding.[5]
Id. at 852 (emphasis added). The court also stated that, although the trial judge stated the reasons for the denial of the defendant’s motion to suppress and found that the prosecution had established all elements of the crime beyond a reasonable doubt, the government’s argument that the defendant had failed to show substantial prejudice and that a judge in a bench trial is presumed to have considered only relevant and admissible evidence was without merit. Id. at 853. The court reasoned, “the destruction of the appearance of impartiality is so prevalent on this record as to strain any such presumption beyond the breaking point.” Id. The court subsequently found that substantial prejudice was obvious in that, “[i]n critical stages of these proceedings, [the] appellant has been deprived of procedural safeguards-the right to fundamental fairness of process.” Id.
¶ 18. We find these cases instructive on the current facts. However, we note that we do not reach the issue of whether the mere act of informing a judge, who is sitting as a fact-finder, that the defendant intends on committing perjury constitutes a denial of a fair trial.[6] We are very *884 aware of the complex ethical issues faced by a lawyer who is presented with knowledge that his client intends to commit perjury. See Brian Slipakoff and Roshini Thayaparan, Note, Current Development 2001-2002: The Criminal Defense Attorney Facing Prospective Client Perjury, 15 Geo. J. Legal Ethics 935, 937 (2002) (“The question of what a lawyer should do when confronted by a perjurious or potentially perjurious client has long caused consternation in the legal profession.”). Our decision in this case is based not on the fact that the trial judge was informed by Scott’s counsel that Scott intended to commit perjury, but rather on the fact that counsel specifically told the judge, who was sitting as finder of fact on Scott’s motion to suppress, that Scott confessed to him that he committed the crime for which he was on trial. We liken the situation at bar to the one in Ferguson, which involved neither an assertion of an ethical dilemma nor a discussion of the ethical considerations surrounding client perjury. The Ferguson court found that the fact that the defendant’s lawyer had called him untruthful before the finder of fact resulted in the defendant’s being denied a fair trial. Ferguson, 507 So.2d at 97. While the disclosure in this case was not quite so dramatic as the one in Ferguson, its effect was equally, if not more, devastating.
 ¶ 19. At the suppression hearing, Scott testified that he did not confess to the killing and that the signatures on the portions of the statement in which he purportedly confessed to the killing were not his signatures.[7] The trial judge, sitting as finder of fact on Scott’s motion to suppress, had just been informed by defense counsel that Scott had confessed to counsel that he committed the crime. If, as in Ferguson, calling the defendant a liar before the trier of fact is impermissible, then surely telling the trier of fact, who was charged with determining the admissibility of the defendant’s alleged confession, that the defendant confessed to committing the crime is as well. We hold that, under the circumstances of this case, after defense counsel revealed Scott’s alleged confession, the trial judge should have re-cused herself from hearing the motion to suppress, and her failure to do so deprived Scott of his right to due process.[8]
*885 ¶ 20. Our holding today is consistent with the above-cited authority regarding Mississippi’s law on recusal. We see no escape from the conclusion that a reasonable person, knowing that a judge has been informed by the defendant’s lawyer that the defendant confessed, would harbor serious doubts about the judge’s impartiality in ruling on the motion to suppress. We also find no merit in the State’s contention that the trial judge did not show any impartiality in her ruling on factual issues. As the court stated in Ferguson, the judge would have had to be “more than human” to be unaffected by knowledge that Scott had allegedly confessed to his lawyer that he committed the crime. Ferguson, 507 So.2d at 97-98. Moreover, as the Butler court noted, the requirements of the Constitution are concerned not with whether the correct result is reached, but with the process by which such result is reached. Butler, 414 A.2d at 853 n. 10. In this case, we cannot say that the process was fair.[9]
¶ 21. We stress that our decision today is grounded in due process, not ethics. Nothing in this decision should be interpreted as authority on the issue of the obligations of an attorney when faced with possible client perjury or whether a defendant’s due process rights are automatically violated when counsel informs the fact-finder of his client’s intention to commit perjury with no accompanying disclosure of highly prejudicial privileged information. We find that Scott was denied a fair trial when the trial judge failed to recuse herself from judging Scott’s motion to suppress. Therefore, we remand this case with instruction that Scott be granted a new hearing on his motion to suppress before an impartial judge and, thereafter, a new trial.[10]
¶22. The dissent contends that this entire situation as created by Scott, and our opinion endorses his effort to “ ‘piddle with the court.’ ” Scott’s attorney had represented to the trial court in chambers that Scott and his “jailhouse lawyer” were trying to “piddle with the court” by having Scott attempt to testify contrary to his confession to his counsel, thereby creating an ethical conflict for counsel. Regardless of the motivation for, or propriety of, Scott’s actions prior to his lawyer’s revelation to the judge that Scott confessed to committing the crime, Scott still had the right to a fair hearing before an impartial fact-finder, and we remain convinced that he was deprived of that right.
¶ 23. We find the dissent’s reliance on the characterizations of Scott’s attorney as justification for denying Scott a new trial to be illustrative of the unusual circum *886 stances presented in this case. In adopting the attorney’s contention that Scott was “piddl[ing] with the court,” the dissent uses the language of Scott’s own attorney against him. Thus, the dissent is influenced by the statements of Scott’s attorney and adopts them as fact, while at the same time vigorously arguing that the trial judge was not influenced by the revelation of Scott’s attorney that Scott confessed to the crime. In our opinion, the dissent’s reliance on the statements of Scott’s attorney only bolsters our conclusion that the trial judge could not help but be influenced by the attorney’s revelation that Scott confessed to committing the crime. If the dissent is so influenced by the attorney’s statements that Scott was “piddlpng] with the court,” then how could the trial judge not be influenced by that statement and the far more prejudicial information that Scott had confessed to his lawyer?
¶ 24. We also note that the dissent does not even address the fact that Scott was not present when his attorney told the judge of the alleged confession. If, as the dissent suggests, an attorney is permitted to divulge to a motions judge, sitting as the finder of fact, that his client has confessed to him to committing the crime for which he is on trial, then the client should, at the very least, be given the opportunity to address the allegations of his attorney before the judge. Scott’s attorney became, in essence, a witness against his client and, not only was Scott never allowed to defend himself, but he was also not even made aware of his attorney’s actions until long after the completion of the trial.[11] We can imagine nothing more unfair than an attorney’s using the statements of his client against him, espe-dally without the defendant’s having any knowledge of the attorney’s actions.
¶ 25. According to the dissent, the majority finds no error in the trial judge’s request for elaboration on Scott’s attorney’s ethical conflict. The dissent quotes from the comment to Mississippi Rule of Professional Conduct 1.16, which states that, when an attorney seeks to withdraw, “[t]he court may wish an explanation of the withdrawal, while the lawyer may be bound to keep confidential the facts that would constitute such an explanation.” Miss. R. Prof. Conduct 1.16 cmt. (2007). The comment provides, however, that “[t]he lawyer’s statement that professional considerations require termination of the representation ordinarily should be accepted as sufficient.” Id. While the dissent goes so far as to state that it was entirely proper for the trial judge to inquire into the basis for the attorney’s attempted withdrawal, we find it unnecessary to pass on the appropriateness of the judge’s actions in the fast-paced exchange with Scott’s attorney. The crucial point is that, as a result of the exchange, the trial judge, who was to sit as the finder of fact on Scott’s motion to suppress immediately thereafter, was told by Scott’s attorney that Scott confessed to him to committing the crime for which he was on trial and intended to commit perjury. The dissent would find this occurrence completely permissible; we, however, cannot escape the conclusion that a reasonable person would doubt the judge’s ability to be impartial under these unique circumstances.
¶26. The dissent devotes a significant portion of its opinion to distinguishing the facts in Lowery, Ferguson, and Butler from those at bar by noting that each of *887 those cases involved a bench trial in which the trial judge was to make the ultimate decision of guilt or innocence. Because Scott’s case involved a jury trial, in which the judge was not called upon to determine Scott’s guilt or innocence, the dissent contends that Scott’s attorney’s revelation that Scott confessed to the crime had no bearing on the judge’s decision regarding the motion to suppress. The dissent reasons that, because the judge was not charged with determining the truthfulness of Scott’s confession, but rather only its admissibility, Scott’s attorney’s revelation did not go to the fact at issue.
¶ 27. Initially, we note that we do not read the court’s decision in Butler as being based solely on the fact that a bench trial was at issue. As we noted previously, the Butler court stated:
It is difficult to imagine how the neutrality of a judge could remain free from compromise when it had been told by defense counsel that the government’s case can be proved beyond a reasonable doubt and that the defendant intends to commit perjury. When the court has regard for the ability and honesty of the lawyer, as the court apparently did here, the credibility of the defendant would necessarily suffer in direct proportion to such regard. Under such circumstances recusal and certification, to another court is the desired procedure ... and we hold that it is mandated. Error in failing to do so is compounded when the judge sits as the trier-of-fact. The due process clause commands fundamental fairness in fact finding.
Butler, 414 A.2d at 852 (emphasis added). By our reading of this language, the Butler court found that the judge, irrespective of whether he was the trier of fact, was required to recuse himself once he was told of the strength of the government’s case and of the defendant’s intention to commit perjury. Therefore, in accordance with Butler, the fact that Scott’s trial was not a bench trial is not dispositive of whether the trial judge should have re-cused herself once she was told by Scott’s attorney that Scott had confessed to committing the crime and intended to commit perjury. Moreover, after discussing the trial judge’s attempts to encourage the defendant to plead guilty, the Butler court stated, “[tjhis was hardly the ‘fair’ hearing by a ‘neutral and detached magistrate’ required for the adjudication of Fourth Amendment claims.” Id. at 858. In the case sub judice, although there are no allegations that the trial judge improperly encouraged a plea bargain, the judge was told prior to sitting as the finder of fact on Scott’s motion to suppress that Scott had confessed to committing the crime and intended to perjure himself. Given these circumstances, Scott was denied the fair hearing of his motion to suppress by a neutral and detached magistrate guaranteed him by the Constitution. We can imagine no more prejudicial information than a defendant’s confession to his lawyer that he committed the crime for which he was on trial.
¶ 28. We also find the dissent’s characterization of the issue in the suppression hearing to be far too narrow. We agree that the trial judge’s ultimate responsibility was to determine the admissibility of Scott’s alleged confession. However, a necessary component of this determination was an assessment of Scott’s truthfulness. Scott’s primary argument in moving to suppress his confession was that he, in fact, never confessed, and he testified extensively in this regard at the hearing. In deciding Scott’s motion, the trial judge was required to make a credibility determination as to the reliability of Scott’s testimony as compared to the testimony of the witnesses for the prosecution. See Wimberly v. *888 State, 760 So.2d 800, 802 (Miss.Ct.App.2000) (stating that when a trial judge sits as the finder of fact in a suppression hearing, he has the “sole authority to determine the credibility of the witnesses”). Therefore, although the judge was not required to determine the truthfulness of Scott’s confession, she was required to determine the truthfulness of Scott himself, and immediately prior to making this determination, the judge was told by Scott’s attorney that Scott had confessed to committing the crime and intended to commit perjury.
¶ 29. The dissent states that “[t]he trial judge’s decision to deny the motion to suppress was based solely on the sworn testimony and evidence presented during the actual suppression hearing, not on what Scott’s lawyer may have said during a conference in the judge’s chambers.” We, however, fail to see on what basis the dissent makes such a conclusion. While there may be no direct evidence of partiality on the part of the trial judge or prejudice to Scott in the record, we remain convinced that the judge would have to be “more than human” to be unaffected by knowledge that Scott had allegedly confessed to his lawyer, especially given that this knowledge was imparted immediately prior to the judge’s hearing testimony on the motion to suppress.[12] Some errors are so fundamental that a new trial is required without concern for whether prejudice is apparent from the record; what occurred in this case constitutes such error.
¶ 30. According to the dissent, the result we reach leads to the conclusion that a trial judge would have to be “more than *889 human” in any bench trial where suppression of a confession was warranted or evidence was found inadmissible. However, as we noted above, one of the judges in Butler addressed this argument as follows:
In a case in which damaging evidence is suppressed by a trial judge who later sits as the finder of fact, this court can review the record to determine whether the evidence properly admitted was sufficient to support a verdict of guilty. But in a case such as this, if the trial judge improperly considers the attorney’s suggestion of the defendant’s possible perjury in weighing the credibility of witnesses and determining guilt, we cannot effectively screen such bias on appeal.
Butler, 414 A.2d at 854 n. 1 (Ferren, J., concurring). In the instant case, although the judge was not charged with determining Scott’s guilt, she was charged with determining the merits of Scott’s motion to suppress, and we have no way of knowing if, in weighing Scott’s credibility during the suppression hearing, she was influenced by the knowledge that Scott had confessed to his attorney and intended to commit perjury. We simply have no way of screening her bias on appeal. Id. The dissent also argues that “granting a new trial will not correct the majority’s perceived constitutional defect in this trial” because, once the majority’s opinion is published, any subsequent judge will be made aware of the basis for this Court’s grant of a new trial and, therefore, will be subject to disqualification. Throughout the appellate process, we have made every effort to ensure that the facts of this case were divulged only to the members of this Court and the litigants. Nonetheless, the rules require that our decisions be published, and we are aware of the practical considerations associated with granting a new trial. However, while we acknowledge that there is no way perfectly to redress the due process violation in this case, we do not view this reality as absolving us of the responsibility to make every attempt to craft a workable solution. The requirements of the Constitution are far too important for us to ignore the due process violation that occurred in this case simply because no perfect remedy exists.
¶ 31. Scott was not given a fair hearing before a neutral and detached magistrate on his motion to suppress his confession. During closing arguments in Scott’s trial, the attorney for the State admitted, and we agree, that the “most overwhelming” and “damning proof of Scott’s guilt” was his confession. Accordingly, with all respect to the dissent, we remain convinced that Scott suffered a due process violation of sufficient severity to warrant granting him a new suppression hearing and trial.
II. Did the trial court err in denying Scott’s motion to dismiss for failure to grant a speedy trial?
¶ 32. Scott argues that his trial was delayed in violation of his constitutional right to a speedy trial. “The Sixth Amendment to the United States Constitution provides that ‘in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.’ ” Jenkins v. State, 947 So.2d 270, 276(¶ 13) (Miss.2006) (quoting U.S. Const, amend. VI). The United States Supreme Court, in Barker v. Wingo, delineated a four-factor framework for determining whether an individual has been denied his right to a speedy trial. Id. (citing Barker, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). “Under the Barker test, courts must balance: (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the defendant was prejudiced by the delay.” Id. (citing Poole v. State, 826 So.2d 1222, 1229-30 (¶ 19-26) (Miss.2002)). “No one *890 factor is dispositive, and the balancing test is not restricted to the Barker factors, so other factors may be considered.” Poole, 826 So.2d at 1228-29(¶ 18). Moreover, the weight which a court gives to each factor depends on the facts of the particular case. Id.
¶ 33. Here, the trial court did not require the State to file a response to Scott’s speedy trial motions nor did the court discuss the Barker factors in denying the motions. Under these circumstances, the Mississippi Supreme Court has held that the reviewing court may proceed de novo in evaluating the Barker factors. De-Loach v. State, 722 So.2d 512, 516(¶ 15) (Miss.1998). Accordingly, this Court will conduct a de novo analysis of the Barker factors.
1. Length of the Delay
¶ 34. “The length of the delay is a threshold issue under Barker.” Jenkins, 947 So.2d at 276(¶ 14) (citing Barker, 407 U.S. at 530, 92 S.Ct. 2182). A court need only proceed to the remaining Barker factors if the length of the delay is determined to be “presumptively prejudicial.” Id. (quoting Barker, 407 U.S. at 530, 92 S.Ct. 2182). In determining the length of the delay for speedy trial purposes, “the relevant time begins to run from the date of arrest.” DeLoach, 122, So.2d at 517(¶ 16). Mississippi case law holds that a delay of eight months is presumptively prejudicial. Id. Scott was arrested on July 23, 2002, and his trial began on March 28, 2005, which amounts to a delay of approximately thirty-two months. Scott acknowledges that three continuances attributable to him encompassed the time span of April 21, 2003, until November 5, 2004, totaling approximately eighteen and one half months. “Delays caused by the defense, such as requests for continuances, will toll the running of the speedy trial clock for that length of time attributable to the continuance.” Hersick v. State, 904 So.2d 116, 121(¶ 8) (Miss.2004) (citing Wiley v. State, 582 So.2d 1008, 1011 (Miss.1991)). Therefore, the time attributable to Scott’s continuances is subtracted from the total delay, leaving approximately thirteen and one half months that are attributable to the State. Because this exceeds eight months, the delay between Scott’s arrest and trial is presumptively prejudicial, and we must analyze the remaining Barker factors in order to determine if Scott’s constitutional right to a speedy trial was violated.
2. Reason for the Delay
¶ 35. “Once the delay is found to be presumptively prejudicial, the burden shifts to the State to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of the reasons.” Jenkins, 947 So.2d at 276-77(¶ 16) (citing Herring v. State, 691 So.2d 948, 953 (Miss.1997); State v. Ferguson, 576 So.2d 1252, 1254 (Miss.1991)). The Barker court said that on this factor different weights should be given to different reasons for delay. Barker, 407 U.S. at 531, 92 S.Ct. 2182. A deliberate attempt by the State to delay the trial in order to hamper the defense should be weighed heavily against the State. Id. However, a more neutral reason for the delay such as negligence or overcrowded dockets should be weighed less heavily; but the delay should, nevertheless, be considered because “the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.” Id. The burden falls on the State to articulate the reason for the delay by showing either that the delay was caused by the defendant or was caused for a good cause. Stark v. State, 911 So.2d 447, 450(¶ 11) (Miss.2005) (quoting Hersick, 904 So.2d at 121(¶ 7)).
*891 ¶ 36. In this ease, the State did not file a response to Scott’s speedy trial motions; thus, the State did not provide a reason for the delay in Scott’s trial. However, on March 23, 2005, in ruling on Scott’s motion to dismiss, the trial court stated the following:
Defendant was indicted in December 2002, was arrested in Marietta, Georgia!,] and extradited back to Mississippi to stand trial. Trial [was] set for March 28, 2005, in a timely manner, with consideration of the court’s overcrowded docket and the time needed for preparation of Defendant’s defense. Speedy trial motion is moot.
“[D]elay due to docket congestion may be weighed against the State, but not heavily.” Clayton v. State, 946 So.2d 796, 801(¶ 15) (Miss.Ct.App.2006) (citing Adams v. State, 583 So.2d 165, 169 (Miss.1991)). Because docket congestion is to be weighed against the State, albeit lightly, and because the State, bearing the risk of non-persuasion on the good cause issue, Vickery v. State, 535 So.2d 1371, 1375 (Miss.1988), provided no explanation or evidence justifying the delay in Scott’s trial, we weigh the reason for the delay in favor of Scott.
3. Assertion of the Speedy Trial Right
¶ 37. “While the State bears the burden to bring the defendant to trial, the defendant has some responsibility to assert the speedy trial right.” Clayton, 946 So.2d at 801-02(¶ 16) (citing Wiley v. State, 582 So.2d 1008, 1012 (Miss.1991)). “[T]he demand for dismissal for violation of the right to speedy trial is not the equivalent of a demand for speedy trial, because such a motion seeks discharge and not trial.” Jenkins, 947 So.2d at 277(¶ 19). Scott claims that he asserted his right to a speedy trial on June 7, 2004, when he stated in a pro se motion: “Scott is prepared to go to trial.” However, the motion to which Scott refers was a motion to substitute court appointed counsel and the above statement was clearly made in the context of Scott’s complaints about his attorney’s failure to prepare for trial or to pursue a defense strategy other than a guilty plea. There is nothing in the motion that would indicate that Scott was asserting his right to a speedy trial. Accordingly, we find that Scott did not assert, his right to a speedy trial at this time.
¶ 38. On February 9, 2005, Scott filed a motion to suppress in which he specifically stated that he was asserting his right to a speedy trial. He then filed two motions to dismiss for violation of his right to a speedy trial on March 10, 2005, and March 21, 2005, respectively, wherein he referenced the February 9th assertion under the heading “Assertion of the Right to a Speedy Trial.” While Scott asserted his right to a speedy trial on February 9, 2005, his trial had already been set for March 28, 2005, by an order of the court dated November 5, 2004. Therefore, at the time Scott asserted his right to a speedy trial, his trial had already been set for three months; moreover, most of the delay between Scott’s arrest and trial had already lapsed when Scott asserted his right to a speedy trial. In DeLoach, 722 So.2d at 518(¶21), the Mississippi Supreme Court weighed this factor against the defendant because he did not assert his right to a speedy trial until one year and seven months after his arrest. See also Murray v. State, 967 So.2d 1222, 1232(¶ 29) (Miss.2007) (weighing this factor in favor of the State because the defendant filed a motion to dismiss for a speedy trial violation, with no demand for a speedy trial, after most of the delay period had elapsed); Hersick, 904 So.2d at 123(¶ 17) (finding that this factor did not weigh in favor of the State or the defendant where *892 the defendant failed to assert his right to a speedy trial until a few weeks before his trial was scheduled to begin); Stogner v. State, 627 So.2d 815, 819 (Miss.1993) (weighing this factor in favor of State when defendant did not raise the speedy trial issue until August 16, 1989, when he was arrested on December 10, 1987). Thus, because Scott did not assert his right to a speedy trial until after most of the delay period had lapsed and approximately seven weeks before his trial, this factor does not weigh in favor of him or the State.
4. Prejudice to the Defendant
¶ 39. The final factor that must be considered in determining if the delay in Scott’s trial deprived him of his right to a speedy trial is the prejudicial effect of the delay. Mississippi’s jurisprudence with regard to the prejudice factor reveals two diverging viewpoints of what a defendant is required to demonstrate with regard to prejudice. On the one hand, the Mississippi Supreme Court has held that, “[w]here the delay has been presumptively prejudicial, the burden falls upon the prosecution” to demonstrate a lack of prejudice. Ferguson, 576 So.2d at 1255. According to this reasoning, the burden of persuasion in this case would belong to the State as we have already determined that the delay in Scott’s trial was presumptively prejudicial. However, the Mississippi Supreme Court has held numerous times that a defendant must demonstrate some type of actual prejudice in order for the prejudice factor to weigh in his favor. In Atterberry v. State, 667 So.2d 622, 627 (Miss.1995), the court stated, while a defendant need not demonstrate an affirmative showing of prejudice in order to prove a speedy trial violation, “an absence of prejudice weighs against a finding of a violation.” Id. (citing Wiley, 582 So.2d at 1012); see also Murray, 967 So.2d at 1232(¶ 30); Manix v. State, 895 So.2d 167, 177(¶ 22) (Miss.2005) (quoting State v. Magnusen, 646 So.2d 1275, 1284 (Miss.1994) (“This Court has declined to infer prejudice to the defense out of the ‘clear blue’ ”)).
¶ 40. When determining whether a defendant has been prejudiced by a delay in being brought to trial, there are three interests that must be considered: (1) the interest in preventing oppressive pretrial incarceration, (2) the interest in minimizing anxiety and concern of the accused, and (3) the interest in limiting the possibility that the defense will be impaired. Hersick, 904 So.2d at 123(¶ 18) (citing Barker, 407 U.S. at 532, 92 S.Ct. 2182). The Barker Court stated:
The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious.... [E]ven if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion and often hostility.
Barker, 407 U.S. at 532-33, 92 S.Ct. 2182. The Mississippi Supreme Court has stated, however, that “[o]f [the] three interests, the last is the most important; and when violated, [it is) the most prejudicial to the defendant.” Hersick, 904 So.2d at 123(¶ 18). Prejudice to a defendant may manifest itself in two ways. First, a defendant may suffer prejudice because of the restraints to his liberty, whether by *893 “loss of his physical freedom, loss of a job, loss of friends or family, damage to his reputation, or anxiety.” Stevens v. State, 808 So.2d 908, 917(¶ 24) (Miss.2002) (citing Duplantis v. State, 708 So.2d 1327, 1336(¶ 22) (Miss.1998)). Second, the delay may impair the accused’s defense. Id.
¶41. Scott asserts the following forms of prejudice: (1) he experienced anxiety and concern; (2) he was not able to work during the time he was incarcerated and, at the time he was arrested, he had a job in Atlanta; (3) he was prevented from attending college even though he was enrolled to begin at Hinds Community College in the Fall of 2002; (4) he was unable to see his mother and child, who resided in another state; and (5) he was unable to locate witnesses in his case. With regard to his claim that the delay in his trial resulted in the inability to locate ■witnesses, Scott does not elaborate on this claim to any extent in his brief; rather, he merely references the pro se motions to dismiss he filed for violation of his right to a speedy trial. In these motions, Scott did not provide the names of witnesses he claimed were lost as a result of the delay in his trial. However, he referenced a pro se motion to subpoena witnesses he filed on October 7, 2004, in which he did name specific witnesses and state to what such witnesses would testify. However, he blamed the unavailability of the witnesses and the loss of documentary evidence on the allegedly deficient performance of his attorney.[13] Moreover, there was a discussion at the beginning of Scott’s trial regarding defense counsel’s inability to locate some of the witnesses listed in Scott’s pro se subpoena motion. We are unable to determine from the record whether Scott in fact lost any witnesses or documentary evidence during the time period between his arrest and trial and whether any such loss was the result of the delay caused by the State rather than the delay caused by Scott. Therefore, we hereby remand this case for an evidentiary hearing addressing the forms of prejudice Scott asserts and a determination of whether Scott was, in fact, prejudiced as a result in the delay of his trial. See Jasso v. State, 655 So.2d 30, 35 (Miss.1995) (remanding the case for an evidentiary hearing on the issue of prejudice because both the State’s and the defendant’s showing was so weak).
III. Did the trial court err in failing to suppress Scott’s alleged statement of confession after the State failed to produce all parties who were witnesses to such statement?
¶ 42. Scott argues that the trial court erred in not suppressing the confession because the State failed to produce all of the individuals who witnessed his alleged confession at the suppression hearing in accordance with Agee. In his motions to suppress, Scott claimed that he was never read his Miranda rights and that his confession was not knowing and voluntary. At the suppression hearing, Scott testified that he did not confess to the killing and that the signatures on the portions of the statement in which he purportedly confessed to the killing were not his signatures. He testified that Officers White and Den-son showed him a picture of a lethal injection table and told him that if he did not cooperate he would end up on such a table, but if he did cooperate, he would only be facing manslaughter charges. Scott further stated that Officer White told him *894 that his friends would remain in custody until he confessed and that, if he cooperated, he might be able to get the Georgia charges dropped.
¶ 43. Scott argues that a notary public and a jail guard were present at the time that he gave his statement; therefore, the State was required to produce them to testify at the suppression hearing. In light of the fact that we are reversing Scott’s conviction and remanding this case for a new suppression hearing and a new trial, we leave this issue for determination by the new trial judge on remand. The dissent is correct that the prosecution need only present those people who are alleged to have coerced or induced a confession, and Scott has not alleged that the notary public or the jail guard coerced or induced his confession. Nonetheless, judicial restraint counsels us to pass upon only those issues necessary to the decision in this case and, given that we are remanding for a new suppression hearing, it is not necessary for us to determine whether the State produced all of the necessary witnesses at the original suppression hearing. Moreover, Scott testified that he signed all three pages of his confession statement and that the notary notarized all three pages; however, only the last page of the statement admitted into evidence was notarized. Scott claimed that the first two pages of the admitted statement were substituted for the real pages that contained his notarized signature. Under these circumstances, we find that the trial judge should determine if the State is required to produce the notary public to testify at the suppression hearing on remand.
IY. Did the trial court err in not granting a mistrial after the prosecutor repeatedly called the defendant a “shyster” and a “con artist”?
¶ 44. Scott argues that the trial court erred in failing to grant a mistrial after the prosecutor, during his closing statement, twice referred to Scott as a “shyster” and a “con artist.” He argues that the prosecutor’s remarks in this regard were made solely to inflame and prejudice the jury against him and were not based on any facts in the record. The prosecutor’s comments were as follows:
Because guess what, he got rid of the gun. He got rid of the purse. He got rid of everything that connected him to Paula Dinkins’[s] murder. Don’t assume that this defendant is not so smart. Oh, he’s smart. He used to be a shyster. He used to be a con artist. But right now today he’s a murderer.
[[Image here]]
And guess what, he hustled him (Marcus Bennett), too, just like the shyster and the con artist that he is.
¶ 45. Scott’s trial counsel did not object to these allegedly prejudicial remarks by the prosecution during the closing argument. The issue was also not raised in the motion for a new trial filed by his attorney nor did Scott raise it in his pro se motion for a new trial. Thus, the State argues that Scott’s prosecutorial misconduct argument was not preserved for appeal. However, in light of the fact that Scott does argue in this appeal that his attorney’s performance was ineffective for failure to object to the above statements and the fact that, we will address the merits of the claim. Regardless of whether Scott’s claim is procedurally barred, we find no prosecutorial misconduct.
¶ 46. “Attorneys are allowed wide latitude in arguing their cases to the jury, but they are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.” Shumpert v. State, 935 So.2d 962, 972(¶ 38) (Miss.2006) *895 (citing Sheppard v. State, 111 So.2d 659, 661(¶ 7) (Miss.2000)). “If this Court determines the prosecutor did engage in misconduct during closing argument, the inquiry is ‘whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.’ ” Id. “The prosecutor may comment on any facts introduced into evidence and may draw whatever deductions and inferences that seem proper to him from the facts.” Id. (citing Flowers v. State, 842 So.2d 531, 554(¶64) (Miss. 2003)).
¶ 47. With regard to what a prosecutor is permitted to argue at trial, the Mississippi Supreme Court has stated the following:
The right to argument contemplates liberal freedom of speech and range of discussion confined only to bounds of logic and reason; and if counsel’s argument is within limits of proper debate, it is immaterial whether it is sound or unsound or whether he employs wit, invective, and illustration therein. Moreover, figurative speech is legitimate if there is evidence on which it may be founded. Exaggerated statements and hasty observations are often made in the heat of the day, which, although not legitimate, are generally disregarded by the court, because in its opinion, they are harmless. There are, however, certain well[-]established limits beyond which counsel is forbidden to go. He must confíne himself to the facts introduced in evidence and to the fair and reasonable deduction and conclusions to be drawn therefrom and to the application of the law, as given by the court, to the facts.... Absent impermissible factors such as commenting on the failure of the defendant to testify, a prosecuting attorney is entitled to great latitude in closing argument.
Walker v. State, 913 So.2d 198, 239 (¶ 153) (Miss.2005) (quoting Evans v. State, 725 So.2d 613, 676 (¶¶ 271-72) (Miss.1997)).
¶ 48. During his trial, Scott admitted that he had previously been convicted of attempted embezzlement, theft, and use of a stolen ATM card. He also admitted that he knowingly used a license plate that was not his in order to travel from Mississippi to Georgia because his tag was expired; and he altered numbers on his social security card. Finally, he admitted that he lied to the police about being married to Tamika Wray. Thus, the prosecutor’s statements in this ease were reasonable conclusions drawn from facts introduced into evidence. The comments fell within the wide latitude afforded prosecutors in trying their cases. Accordingly, Scott’s argument is without merit.
V. Did Scott’s appointed trial counsel render ineffective assistance of
counsel?
¶ 49. Scott argues that his appointed counsel’s representation was ineffective in numerous ways; therefore, he was deprived of his constitutional right to effective assistance of counsel. However, we conclude that Scott’s ineffective assistance of counsel claim would be more appropriately brought in a motion for post-conviction relief. Accordingly, we hereby dismiss Scott’s claim of ineffective assistance of counsel without prejudice.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY, FIRST JUDICIAL DISTRICT, IS REVERSED, AND THIS CASE IS REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., MYERS, P.J., IRVING, CHANDLER AND ISHEE, JJ., CONCUR. ROBERTS, J., CONCURS *896 IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY LEE, P.J., GRIFFIS AND CARLTON, JJ.

. When asked by the trial judge if Scott would likely confess to another attorney if one were so appointed, Scott’s counsel stated that he did not believe Scott would do so.

. Scott contends that he never confessed to his attorney.

. The State argues that this claim is procedurally barred based on Scott’s failure to request recusal at trial or in his pro se motion for a new trial. However, Scott was not aware of his attorney's action until after the trial when the transcript of the ex parte conferences was unsealed. Scott's appellate counsel moved to have the transcript unsealed on January 11, 2006, long after Scott filed his pro se motion for a new trial on April 26, 2005. Therefore, as Scott had no way of knowing what took place during the ex parte conferences, he would have no cause to object at trial or raise the issue in his motion for a new trial. The State contended at oral argument that Scott stated in his affidavit from February 2007 that, on February 10, 2004, he "wrote to the Mississippi Bar about client-lawyer confidentiality being broken.” This statement, accord *879 ing to the State, belies Scott's contention that he was unaware that his attorney told the judge that he confessed. However, there is nothing in Scott's statement to indicate that he was referring to his attorney's actions in the ex parte conference, especially since the in chambers conferences at issue did not occur until March of 2005.

. Rule 1.6 governs attorney-client confidentiality. Miss. R. Prof. Conduct 1.6.

. In Butler, the trial court specifically indicated, prior to the bench trial, that he believed that the defendant had changed his story. Butler, 414 A.2d at 852. The court also found that the fact that the trial judge made "references to the strength of the government’s position, [and] ... speculated] as to the length of incarceration ... [and] ... the chances of the defendant prevailing on the motion to suppress or at trial before a jury if he did not enter a plea-all interposed with admonitions that the decision was one for the defendant and the judicial assessment that the government had made a good offer” was improper and further deprived the defendant of a fair hearing and trial. Id. at 852-53.

. In both Lowery and Butler, the court discussed ABA Defense Function Standards § 7.7, which recommends that an attorney, faced with the prospect of client perjury, should first advise the client against testifying falsely and, if unsuccessful, should then attempt to withdraw if feasible. Lowery, 575 F.2d at 730 n. 3. The Standards go on to state that, if withdrawal is not feasible or if the defendant insists on testifying, the lawyer should allow the defendant to testify in the narrative but should not reveal the defendant's intention to perjure himself to the court. See id. at 730-31; Butler, 414 A.2d at 850. Standard 7.7 was not approved by the ABA House of Delegates in 1980, and the ABA has indicated that an attorney will not shield himself from a charge of assisting a client’s perjury by relying on the narrative approach, ABA Commission on Ethics and Professional Responsibility, Formal Opinion 87-353 (1987), although the comments to the Mississippi Rules of Professional Conduct 3.3 clearly name the narrative approach as one of the proposed options for addressing potential client perjury. See also Nix v. Whiteside, 475 U.S. 157, 159-176, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (finding that an attorney does not breach a duty to his client in informing the court of his client’s intention to commit perjury and stating in dicta that the Model Rules of Professional Conduct require disclosure); but see id. at 177, 106 S.Ct. 988 (Brennan, J., concurring) ("Unfortunately, the Court seems unable to resist the temptation of sharing with the legal community its vision of ethical conduct. But let there be no mistake: the Court’s essay regarding what constitutes the correct response to a criminal client's suggestion that he will perjure himself is pure discourse without force of law.”). However, we do not interpret the Butler and Lowery courts’ holdings regarding recusal and due process to derive solely from the recommendations in Standard 7.7; rather, by our reading, the courts’ purpose in discussing Standard 7.7 was to demonstrate that an attorney would not run afoul of the ethics standards, as recognized at that time, or due process by relying on the narrative approach rather than informing the fact-finder of the client’s intended perjury. See Lowery, 575 F.2d at 731 ("Thus, it does not follow from our holding that a passive refusal to lend aid to what is believed to be perjury in accordance with the Defense Function Standards would violate due process.”). In fact, the Lowery court stated; "Problems of ethics are not before us. *884 Our sole concern relates to the requisites of due process and fair trial.” Id. at 731 n. 6. Moreover, in this case, Scott’s counsel did not merely inform the judge that Scott intended to commit perjury, he specifically told the judge that Scott confessed to committing the crime to counsel prior to the judge sitting as the fact-finder on Scott’s motion to suppress his alleged confession to JPD officers, and it is this revelation upon which our holding is based. We express no opinion as to the obligations under the rules of ethics of an attorney faced with a client who intends to testify falsely.

. He also testified that Officers White and Denson showed him a picture of a lethal injection table and told him that if he did not cooperate he would end up on such a table. Scott further stated that Officer White told him that his friends would remain in custody until he confessed and that, if he cooperated, he might be able to get the Georgia charges dropped.

. We also agree with the following statement of the Butler court with regard to how the situation at bar differs from the situation in which a judge hears a motion to suppress a confession, grants the motion, and then sits as the finder of fact in a bench trial:
In a case in which damaging evidence is suppressed by a trial judge who later sits as the finder of fact, this court can review the record to determine whether the evidence properly admitted was sufficient to support a verdict of guilty. But in a case such as this, if the trial judge improperly considers the attorney's suggestion of the defendant’s possible perjury in weighing the credibility of witnesses and determining guilt, we cannot effectively screen such bias on appeal.
Butler, 414 A.2d at 854 n. 1 (Ferren, J., concurring).

. The State also argued at oral argument that defense counsel was permitted to reveal the privileged information of Scott’s alleged confession pursuant to Mississippi Rule of Professional Conduct 1.6(b)(4) and (5), which permit an attorney to reveal confidential information in order to secure legal counsel regarding the attorney's compliance with the rules or to establish a defense in a controversy between the attorney and the client. Miss. R. Prof. Conduct 1.6(b)(4) and (5). However, there is no indication that Scott’s counsel was seeking legal advice from the trial judge when he divulged the confidence at issue in this case. Moreover, while Scott had made various allegations of ineffective assistance against defense counsel, counsel was not defending against such claims in the ex parte conferences. Rather, he was attempting to withdraw from representation on account of his ethical dilemma.

. Scott also argues that the trial judge erred in failing to grant his counsel’s motion to withdraw and that he was denied both counsel and the right to be present at a critical phase of the proceeding when he was prevented from being at the ex parte in-chambers conference. As we have already determined that Scott is entitled to a new trial, we need not reach these claims.

. We note that, despite Scott’s attorney’s efforts to comply with the rales of ethics, he proceeded, with the purported knowledge that Scott had confessed to committing the crime, to directly question Scott regarding whether he committed the murder during Scott's narrative testimony.

. During Scott's trial, Antoine Reed testified that, after he found Dinkins dead at the Cash Depot, the police questioned him regarding whether he had noticed any suspicious individuals or behavior. When he attempted to answer by stating, "I told them that ...,” defense counsel objected on the grounds that no predicate of personal knowledge on the part of Reed had been laid. The trial judge overruled the objection, and Reed continued as follows: “Prior to that Saturday, [Dinkins] called me and told me that — ,” at which point defense counsel again objected on hearsay grounds. The trial court instructed the witness to avoid saying what “she said” and just tell the court what he “learned" from the conversation. Reed then answered: “On Saturday there was a gentleman outside the store adjacent to our building.” Reed identified that man as Scott and stated that Scott tried to enter the building. Defense counsel's continuing objection was again overruled. Later in the trial, an investigator referenced Reed's statement in this regard when testifying as to how Scott became a person of interest in the investigation. The trial judge again overruled defense counsel's objection and instructed the witness to not to say “he said, she said,” but to just testify as to what he “learned” in his investigation. He then stated: “The weekend prior to this incident [Scott] was at that location attempting to force his way behind the glass partition.” The attorney for the State then referenced this testimony during closing arguments, stating that if it were not for the victim having mentioned to her co-worker that Scott made her feel uneasy prior to her death, the case could have very easily gone unsolved.
Mississippi Rule of Evidence 602 states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.” M.R.E. 602. The comment to the rule states that, while "Rule 602 does not prevent ... the witness from testifying about hearsay statements, ... he cannot testify about the subject matter contained in the hearsay statement." Although the witnesses in this case did not testify directly as to what Dinkins told them, it is obvious that the only way they “learned” of the event was through Dinkins. Therefore, their testimony in this regard was hearsay as it was based only on what Dinkins had told them, and the trial judge erred in overruling Scott’s continuing objections. While we cannot say definitively that these rulings resulted from bias, we have to question how diligent the trial judge was ensuring that statements prejudicial to Scott were not improperly admitted when she had been told by Scott’s attorney that Scott had confessed to committing the crime.

. He stated that several witnesses that were named in his pro se subpoena motion filed on October 7, 2004, were not able to be located, but followed with "if the court had heard the hearing of his motion [sic] to substitute counsel in a timely manner, his witness [sic] could have been located sooner and certain important documents could have been admitted as evidence crucial to his defense.”